**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

RUDY JOUVERT, a/k/a, RUDOLPHO
ERRIQUE JOUVERT,
                              Plaintiff,

              v.                                              No. 10-CV-930
                                                                  (MAD/CFH)
NEW YORK STATE; A. CUOMO, Attorney
General, State of New York; K. BELLAMY,
Director of Inmate Grievance Program;
D. ARTUS, Superintendent, Clinton
Correctional Facility; R. MULLER,
Correctional Officer, Clinton Correctional
Facility; D. MENARD, Sergeant, Clinton
Correctional Facility; J. FARRELL,
Correctional Officer, Clinton Correctional
Facility; MILLER, Lieutenant, Clinton
Correctional Facility,
                              Defendants.
_____

**APPEARANCES:**                                     **OF COUNSEL:**

RUDY JOUVERT
Plaintiff Pro se
129 W. 170th Street, Apt. 3A
Bronx, New York 10452


HON. ERIC T. SCHNEIDERMAN          C. HARRIS DAGUE, ESQ.
Attorney General for the                   Assistant Attorney General
   State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341



**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**


                    **REPORT-RECOMMENDATION AND ORDER**[1]
_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Rudy Jouvert ("Jouvert"), formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action against New York State, the former Attorney General for New York State, and six DOCCS employees, alleging violations of the Civil Rights Act, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1 et seq. ("RLUIPA"), the New York State Constitution, and New York Correction Law. Compl. (Dkt. No. 1). Jouvert contends that defendants deprived him of his statutory rights to religious freedom as well as his constitutional rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Id.

Presently pending is a motion to dismiss certain claims and defendants pursuant to Fed. R. Civ. P. 12(c).[2] Dkt. No. 39. By order dated April 16, 2012, this Court granted Jouvert until May 18, 2012 to file a response to the instant motion and notified Jouvert that failure to respond may result in the dismissal of this case. Dkt. No. 40. This motion remains unopposed. Dkt. report entry dated 5/22/2012. For the following reasons, it is recommended that the defendants' motion be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to Jouvert as the non-moving party. See subsection II(A) infra.

Jouvert is a practicing Muslim who wears his hair in dreadlocks. Compl. (Dkt. No. 1)

---

[2]Defendants do not seek dismissal of Jouvert's retaliation claims. Defs.' Mem. of Law (Dkt. No. 39-1) at 3 n.1; Compl. ¶ 37. In addition, defendants do not address Jouvert's claims under the New York State Constitution, article I, §§ 3, 5, 6, 8, 11, and 12 and claims under NY Correction Law § 610(1).

¶¶ 4, 5. On May 19, 2008, three days after Jouvert's arrival at the Clinton Correctional

Facility ("Clinton"), Jouvert went to obtain an identification card, at which time defendant

Officer Muller ordered him to change his religious designation from Muslim to Rastafarian

since only Rastafarians are allowed to wear their hair in dreadlocks. Id. ¶¶ 4, 5. Jouvert

refused and filed a grievance[3] against Muller for violating his rights under the RLUIPA and

the New York State Constitution. Id. ¶ 6. Defendant Artus, a superintendent, denied

Jouvert's grievance on June 24, 2008 and defendant Bellamy, director of the IGP, denied

Jouvert's appeal, affirming Artus's decision on August 6, 2008. Id. ¶¶ 7, 8.

At the identification room on October 7, 2008, Muller issued a misbehavior report

against Jouvert and ordered to have Jouvert keeplocked[4] for refusing to change his

religious designation while wearing dreadlocks. Compl. ¶¶ 9, 12. On October 14, 2008,

defendant Miller, a lieutenant, upheld Muller's keeplock order. Id. ¶ 10. Jouvert filed a

second grievance against Muller. Id. ¶ 11. On October 24, 2008, the IGRC deadlocked

when contemplating Jouvert's grievance; however, Superintendent Artus again denied

Jouvert's grievance on November 4, 2008. Id. ¶ 12.

On January 7, 2009, at the Eastside mess-hall, defendant Menard, a Sergeant who was

assigned to investigate Jouvert's second grievance against Muller, accosted and ordered

---

[3]The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:  (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

[4]"Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. Gittens v. Lefevre, 891 F.2d 38, 39 (2d Cir 1989) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 251-1.6 (2012)).

both Jouvert and another inmate named Douglas to change their religious designation to Rastafarian because they both had dreadlocks. Compl. ¶ 13. Jouvert submitted a grievance against Menard concerning this order. Id. ¶ 14.

On January 12, 2009, in an attempt to avoid receiving another misbehavior report and jeopardizing his release on parole supervision, Jouvert wrote to the chaplain, requesting to change his religious designation while noting that the change was against his will. Compl. ¶ 15. Jouvert's request was denied. Id. Subsequently on January 21, 2009, Menard issued a misbehavior report against Jouvert for not changing his religious designation. Id. ¶ 16. Miller upheld the misbehavior report and Jouvert was placed in keeplock confinement for thirty days, which prevented Jouvert from taking a General Equivalency Diploma ("GED") exam and resulted in the denial of Jouvert's parole release because he appeared at his parole hearing in shackles. Id. ¶ 17.

Jouvert contends that on January 29, 2009, Superintendent Artus ordered Captain Ulher to deny his request to attend Islamic services during the course of his keeplock confinement. Compl. ¶ 18. It was also during this confinement period, on February 4, 2009, that Artus denied Jouvert's grievance against Menard. Id. ¶ 19.

On February 12, 2009, in the East-Block, defendants Menard and Officer Farrell again ordered Jouvert to change his religious designation. Compl. ¶ 20. The day after, Farrell issued a misbehavior report against Jouvert for not changing his religious designation. Id. ¶ 21. Jouvert filed grievances against both Menard and Farrell based on this incident, but received no response. Id. ¶ 22. Eventually, between February 17 and 21, 2009, Miller imposed another thirty days of keeplock confinement on Jouvert. Id. ¶ 23. Between February 18 and 21, 2009, Jouvert appealed this decision to Artus, but again received no

4

response.  Id. ¶ 24.

On February 26, 2009, motivated by fear of further reprisal, specifically concerning his conditional release date of August 20, 2010, Jouvert changed his religious designation from Islam to Rastafarian.  Compl. ¶¶ 26, 27.  Jouvert was released from keeplock on March 21, 2009 and his request to change his religious designation was official on March 23, 2009. Id. ¶¶ 26–28.

On April 2, 2009, Menard again ordered Jouvert to change his religious designation. Comp. ¶ 29.  Despite Jouvert's attempts to explain that he had changed his religious designation, Menard issued a misbehavior report against Jouvert.  Id.  However, on April 4, 2009, Miller dismissed Menard's misbehavior report upon discovering that Jouvert had previously changed his religious designation.  Id. ¶ 30.  Jouvert filed a grievance against Menard for issuing the misbehavior report but he never received a response.  Id. ¶ 31.

Overall, Jouvert alleged that he was subjected to over a hundred days of keeplock confinement for not changing his religious designation.  Compl. ¶ 40.  In addition to the confinement, Jouvert alleged that his injuries included being:  prevented from taking a GED exam; denied early parole release because he was shackled at the parole board hearing; forced to change his religious designation; and prevented from participating in Islamic classes, Islamic Friday services, and the fast during Ramadan of 2009.  Id.

On August 2, 2010, Jouvert commenced this action, seeking monetary damages and injunctive relief.  Compl. ¶¶ 41–42.  Jouvert has since been released from the custody of DOCCS.  Dkt. report entry dated 1/5/2012.  Defendants filed a motion to dismiss on March 16, 2012.  Dkt. No. 39.  By order, the Court notified Jouvert that failure to file a response to the motion to dismiss on or before May 18, 2012 would lead the Court to assume that he

did not oppose defendants' motion and may result in the dismissal of this action. Dkt. No.

40. Because Jouvert did not file any opposition papers on or before May 18, 2012, the

motion remains unopposed.


## II. Discussion

Jouvert contends that defendants violated his rights under the First, Eighth, and

Fourteenth Amendments, the RLUIPA, and the New York State Constitution by denying him

his right to freely practice his religion, retaliating against him for filing grievances, and

conspiring against him in order to deprive him of his religious rights based on DOCCS's

policy on inmate's use of dreadlocks in their hair ("dreadlock policy").[5] Liberally construing

the complaint, Jouvert also alleges constitutional deprivations surrounding his ability to

participate in educational programs such as taking the GED exam, being prejudiced at a

parole hearing, and interference with religious practices such as being precluded from

attending religious services while in keeplock.

Defendants argue that: (1) the Eleventh Amendment bars Jouvert's claims against New

York State and individual defendants in their official capacities; (2) Jouvert failed to allege

the personal involvement of Cuomo and Bellamy as to the §1983 claims; (3) Jouvert failed

to allege a cognizable liberty interest for due process claims under the Fourteenth

Amendment; and (4) qualified immunity applies to all moving defendants with regards to

---

[5]Jouvert also alleged that defendants violated his Fourth, Fifth, and Eighth Amendment rights. However, even a liberal reading of Jouvert's complaint does not indicate that either the Fourth, Fifth, or Eighth Amendment was implicated, nor does Jouvert allege facts to support a violation under any of the above Amendments. As such, the Court considers these contentions as mere errors.

Jouvert's challenge to DOCCS's dreadlock policy.

## A. Legal Standard

In deciding a Rule 12(c) motion for judgment on the pleadings, we "employ[ ] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)."  Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010) (citation omitted).  Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor."  Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).  However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face."  Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."));  see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).  Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 680.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).

## B. Eleventh Amendment

New York State and all individual defendants seek dismissal of Jouvert's claims against them in their official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the

nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

The Eleventh Amendment also serves to protect state defendants in both their official and individual capacities from RLUIPA claims for monetary damages. See Pilgrim v. Artus, No. 07-CV-1001 (GLS/RFT), 2010 WL 3724883 (N.D.N.Y. Mar. 18, 2010) (discussing Eleventh Amendment immunity and RLUIPA decisions in this Circuit) (Dkt. No. 39-2) at 27; see also Pugh v. Goord, 571 F. Supp. 2d 477, 509 (S.D.N.Y. 2008). "To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." Pugh, 571 F. Supp. 2d at 509 (citations omitted). As such, monetary claims against state defendants in their official capacities are unavailable under the RLUIPA because the Act does not unambiguously waive sovereign immunity. Id. Similarly, monetary claims against individual defendants in their individual capacities raise constitutional concerns. Because the RLUIPA was enacted

9

pursuant to the Spending Clause rather than § 5 of the Fourteenth Amendment, which entrusts Congress with the power to enforce the provisions of the Fourteenth Amendment, Congress lacked constitutional authority to enforce RLUIPA against individual defendants in their individual capacities. Pilgrim, at 28–29.

Here, Jouvert seeks monetary damages against New York State and the individual defendants for acts occurring within the scope of their duties with DOCCS. Thus, the Eleventh Amendment bar applies and serves to prohibit both Jouvert's § 1983 and RLUIPA claims for monetary damages against New York State and the individual defendants in their official capacities. Likewise, Jouvert's RLUIPA claims for monetary damages against the individual defendants in their individual capacities are also barred.

Jouvert also seeks injunctive relief of having defendants: (1) end harassment against him; (2) expunge his misbehavior reports and punishments; (3) abolish law and directives favoring a particular religion; (4) ensure his August 20, 2010 conditional release date is not "sabotaged;" and (5) allow him to change his religious designation back to Islam. Compl. ¶ 40. A suit that seeks injunctive relief against officials acting in their official capacities is not generally barred by the Eleventh Amendment provided that the injunctive relief sought is to enjoin an official to conform his or her conduct to constitutional requirements. See Pennhurst, 465 U.S. at 100; see also Ex parte Young, 209 U.S. 123, 159–60 (1908). A court must inquire whether the complaint seeks prospective, injunctive relief to end an "ongoing violation of federal law." Aiken v. Nixon, 236 F. Supp. 2d 211, 227 (N.D.N.Y. 2002), aff'd, 80 F. App'x 146 (2d Cir. 2003). In this case, Jouvert has been released from the custody of DOCCS. See Dkt. report entry dated 1/5/2012. As such, the alleged violations of federal law are no longer ongoing, nor does Jouvert contend otherwise, and

thus the claims for injunctive relief are moot.  See Hallett v. New York State Dep't. of Corr.

Servs., 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) (holding that when plaintiff "is no longer

incarcerated . . . requests for injunctive relief are dismissed as moot.").  Accordingly, it is

recommended that defendants' motion on this ground be granted.


### C.  Personal Involvement

Defendants contend that Jouvert failed to establish the personal involvement of Cuomo

and Bellamy in his complaint.  "'[P]ersonal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright

v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d

880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because

they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[6]

## 1. Cuomo

Jouvert failed to allege personal involvement on the part of former Attorney General and present Governor Cuomo. It is well-settled that a motion to dismiss a complaint with regards to a certain defendant may be granted "where the complaint names [him] in the caption but contains no allegations indicating how [he] violated the law or injured the plaintiff . . . ." Dove v. Fordham Univ., 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (internal quotations omitted) (listing cases). Here, the only allegation that Jouvert made against Cuomo was that he "approved and encouraged . . . [other named] defendants to draft, distribute, and enforce the constitutionally retarded and merit-less directive" concerning inmates' use of dreadlocks in their hair. Compl. ¶ 34. This conclusory statement does not support a plausible claim that Cuomo either created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom. Accordingly, defendants' motion on this ground should be granted.

---

[6] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

12

## 2.  Bellamy

Jouvert has alleged personal involvement on the part of Bellamy.  Jouvert contends that Bellamy violated his statutory and constitutional rights by ruling against his grievance appeal.  Compl. ¶ 8.  Defendants contend that Bellamy, as the director of the inmate grievance program, was not involved in the grievance appeal process because she is not authorized by regulations to serve as a voting member of CORC.[7]  Defs.' Mem. of Law at 10–11.  Despite that regulation, construing Jouvert's complaint liberally and accepting all factual allegations in the complaint as true, Jouvert has sufficiently alleged that Bellamy was in fact involved in his grievance appeal.  Therefore, Jouvert has established personal involvement on the part of Bellamy.  Accordingly, defendants' motion on this ground should be denied.

## D.  Procedural Due Process

Defendants argue that Jouvert failed to allege facts sufficient to state a procedural due process claim.  As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property.  See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001).  To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995).  This standard requires a prisoner to establish that the deprivation was

---

[7]N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(d)(2)(iii) (McKinney 2012) provides:

> The director, IGP, is not a voting member of the CORC.  The director will, however, be responsible for the administrative function of the IGP.  The director, IGP, as the commissioner's designee, shall ensure implementation of CORC decisions.

atypical and significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996).  The fact that an inmate has been disciplined with segregated confinement alone is insufficient to establish an atypical and significant deprivation.  "Both the conditions and [the] duration [of the confinement] must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."  Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999).  Framed in more concrete terms, the Second Circuit has held that "[where] the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of conditions of the confinement relative to ordinary prison conditions is required."  Palmer v. Richards, 364 F.3d 60, 64–65 (2d Cir. 2004).  "In the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in [confinement] was exceedingly short—less than the 30 days . . . [with] no indication that the plaintiff endured unusual [confinement] conditions."  Id. at 65–66.

In this case, Jouvert alleged that he served more than a hundred days of keeplock at Clinton.  Compl. ¶ 40.  Since this period is over thirty days and carries Jouvert's confinement into the intermediate duration set forth by the Second Circuit, and Jouvert's allegations were silent on the conditions of his confinement, a development of a detailed record of the conditions of his confinement is required.  Accordingly, defendants' motion on this ground should be denied.

14

## E. Other Claims

In addition to the claims discussed above and addressed by the defendants, a liberal reading of Jouvert's complaint demonstrates that he also claims defendants violated his (1) due process rights by preventing him from taking a GED exam, (2) due process rights by adversely affecting his parole release hearing; and (3) First Amendment and RLUIPA rights by interfering with his religious practices while he was in keeplock.

### 1. Due Process

### i. Educational Programs

As a threshold matter, an inmate asserting a violation of his right to due process must establish the existence of a protected interest in life, liberty, or property. See, e.g., Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). It is well-settled that public education is not a substantive fundamental right protected under the Fourteenth Amendment of the U.S. Constitution. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973); Plyler v. Doe, 457 U.S. 202, 221 (1982)). Specifically, neither a property nor a liberty interest exists in an educational program in prison. Myers v. Johns, No. 05-CV-1448 (GTS/GJD), 2008 WL 5115249, *11 (N.D.N.Y. Dec. 4, 2008) (citing cases).[8] The Second Circuit has examined the question of whether New York's constitutional and statutory laws create a property interest in education, finding that a property interest, if any, is only triggered when there is "no education at all or education that was wholly unsuited to the goals of a particular inmate's socialization and rehabilitation . . . ." Handberry v. Thompson, 446 F.3d

---

[8]All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

15

335, 354 (2d Cir. 2006) (citing <u>Clarkson v. Coughlin</u>, 898 F. Supp. 1019, 1041 (S.D.N.Y. 1995)).

Jouvert's due process claim relating to the GED exam must fail. He does not allege that he was completely denied educational programs nor that the education provided was wholly unsuited to his socialization and rehabilitation. Rather, Jouvert alleged that he was only denied once the opportunity to take an exam. Because Jouvert failed to allege that the denial of taking the GED exam created a cognizable property interest, he has failed to state a claim upon which relief can be granted.

Accordingly, Jouvert's due process claim against all defendants for denying him the opportunity to take the GED exam should be dismissed.

### ii. Parole Release

The Supreme Court has held that

> while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

<u>Robles v. Dennison</u>, 745 F. Supp. 2d 244, 263 (W.D.N.Y. 2010) (citing <u>Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex</u>, 442 U.S. 1, 7 (1979); <u>Bd. of Pardons v. Allen</u>, 482 U.S. 369, 371 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. <u>Barna v. Travis</u>, 239 F.3d 169, 170–71 (2d Cir. 2001) (citing <u>Greenholtz</u>, 442 U.S. at 11–13)). Because Jouvert

failed to allege that he has a liberty interest in his parole, he has failed to state a due process claim.

Accordingly, Jouvert's due process claim against all defendants for adversely affecting his parole release hearing should be dismissed.


## 2. First Amendment and RLUIPA

The First Amendment protects the right to free exercise of religion.  See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).  This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered are considered: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89–91 (1987).

""[P]risoners have a constitutional right to participate in congregate religious services."

Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). "Confinement in keeplock does not deprive prisoners of this right." Id. (citations omitted). While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

Jouvert contends that his religious beliefs were substantially burdened from being denied participation in Islamic classes, Islamic Friday services, and the fast during Ramadan of 2009. While Jouvert does not articulate the nature of the classes, the number of times he was deprived of participating in religious services, and why or how the deprivation substantially burdened him, a properly pled complaint may state a plausible claim under the First Amendment. Accordingly, it is recommended that Jouvert file an amended complaint that contains all relevant facts regarding these First Amendment claims.

As discussed, see subsection II(B) supra, because Jouvert's RLUIPA monetary claims are barred by the Eleventh Amendment and any claims for injunctive relief are moot, Jouvert's RLUIPA claims of interference with religious practices are unavailing.

18

Accordingly, it is recommended that these RLUIPA claims be dismissed.

## F. Qualified Immunity

Finally, defendants assert the affirmative defense of qualified immunity against Jouvert's contention that they violated his First Amendment and RLUIPA rights by creating and enforcing a DOCCS's inmate dreadlock policy. See generally, Compl. Jouvert specifically alleged that: (1) Muller, Menard, and Farrell ordered him to comply with the policy and issued misbehavior reports against him for failing to comply with the policy; (2) Miller inappropriately upheld Muller, Menard, and Farrell's misbehavior reports; (3) Artus denied his grievances concerning the policy; (4) Bellamy denied his grievance concerning the policy and drafted and enforced the dreadlock policy; and (5) Cuomo approved and encouraged the distribution and enforcement of the policy. Id.

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken, 236 F. Supp. 2d at 229–30. However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there

is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.   Here, the second prong of the inquiry must be discussed with regard to Jouvert's First Amendment right to religious free exercise claims against defendants in their individual capacities.  The second prong need not be addressed with respect to Jouvert's RLUIPA claims because, as discussed supra, monetary damages and injunctive relief against defendants are unavailable under the RLUIPA.

It is well settled that between May 19, 2008 and April 4, 2009 the First Amendment protected an inmate's right to religious free exercise in prison.  McEachin v. McGuinnis, 357 F.3d 197, 204 (2d Cir. 2004).  However, the scope of this right with regards to whether DOCCS'S dreadlock policy violated an inmate's First Amendment right to religious free exercise was not clearly established.  This district has recognized that while "Rastafarians have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, . . . neither the Supreme Court nor the Second Circuit has ruled that other, non-Rastafarian inmates are similarly entitled to such protection." Pilgrim, at 30–31.  On the other hand, the Western District of New York has reasoned that the same dreadlock policy is flawed because "DOCS's determination to restrict dreadlocks to individuals who profess to be Rastafarian is not the least restrictive means of managing the security risks associated with dreadlocks."  Amaker v. Goord, No. 06-CV-490A(Sr), 2010 WL 2595286 (W.D.N.Y. Mar. 25, 2010) (Dkt. No. 39-3) at 8.  Because the law surrounding the wearing of dreadlocks by non-Rastafarians is unclear, "a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was

20

unlawful." Pilgrim, at 31. Accordingly, it is recommended that defendants' motion on this ground be granted.

## III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion to dismiss (Docket No. 39) be:

    A.    **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities and defendant New York State; (2) Eleventh Amendment bar to RLUIPA claims against individual defendants in both their official and individual capacities; (3) the personal involvement defense to § 1983 claims against Cuomo; and (4) the qualified immunity defense to all defendants with regards to DOCCS's dreadlock policy;

    B.    **DENIED** as to the (1) the personal involvement defense to § 1983 claims against Bellamy; and (2) the Fourteenth Amendment due process claims against defendants Bellamy, Artus, Muller, Menard, Farrell, and Miller.

2. Further **RECOMMENDED** that defendants New York State and Cuomo be dismissed as well as all claims regarding the dreadlock policy.

3. Further **RECOMMENDED** that, for the sake of judicial efficiency, the surviving claims and defendants, specifically Jouvert's:

    A.    Claims under the New York State Constitution and NY Correction Law against all individual defendants and defendant New York State;

    B.    First Amendment retaliation claims against defendants Bellamy, Artus, Muller, Menard, Farrell, Miller in their individual capacities with respect to the

issuance of grievances and misbehavior reports;

C.     First Amendment free exercise claims against defendants Bellamy, Artus, Muller, Menard, Farrell, Miller in their individual capacities with respect to the denial of attending religious classes and services;

D.     Fourteenth Amendment due process claims against defendants Bellamy, Artus, Muller, Menard, Farrell, Miller in their individual capacities with respect to keeplock confinement;

should be consolidated into an amended complaint, which should contain all relevant facts regarding these claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).


Dated:  October 23, 2012
          Albany, New York

_Christian F. Hummel_
Christian F. Hummel
U.S. Magistrate Judge