**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**RUDY JOUVERT,**
**a/k/a Rudolpho Errique Jouvert,**

**Plaintiff,**

**-v.-**

**NEW YORK STATE; ANDREW CUOMO,** Attorney
General, State of New York**; KAREN BELLAMY,** Director of
Inmate Grievance Program**; DALE ARTUS,** Superintendent,
Clinton Correctional Facility**; R. MULLER,** C.O., Clinton
Correctional Facility**; D. MENARD,** Sgt., Clinton Correctional
Facility**; J. FARRELL,** C.O., Clinton Correctional Facility;
**and MILLER,** Lieutenant, Clinton Correctional Facility,

**Defendants.**

**9:10-CV-0930**
**(MAD/CFH)**

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **CARTER, CONBOY, CASE, BLACKMORE,** | **ALAINA K. LAFERRIERE, ESQ.** |
| **MALONEY & LAIRD, P.C.** | |
| 20 Corporate Woods Boulevard | |
| Albany, New York 12211-2362 | |
| Attorneys for Plaintiff | |
| | |
| **OFFICE OF THE NEW YORK** | **C. HARRIS DAGUE, AAG** |
| **STATE ATTORNEY GENERAL** | |
| The Capitol | |
| Albany, New York 12224 | |
| Attorneys for Defendants | |

**MAE A. D'AGOSTINO, United States District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff Rudy Jouvert, formerly an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), brought this action against

New York State, the former Attorney General for New York State, and six DOCCS employees,

alleging violations of the Civil Rights Act, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1 *et seq.* ("RLUIPA"), the New York State Constitution, and New York State Correction Law.  *See generally* Dkt. No. 1.  Plaintiff contends that Defendants deprived him of his statutory rights to religious freedom, as well as his constitutional rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  *See id.*  Although Plaintiff commenced this action *pro se*, he is now represented by counsel.

On March 16, 2012, Defendants filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 39.  In a January 29, 2013 Decision and Order, the Court granted in part and denied in part Defendants' motion for judgment on the pleadings.  Specifically, the Court found that the Eleventh Amendment bars Plaintiff's claims against Defendant New York and the individual Defendants sued in their official capacities insofar as the complaint seeks monetary damages against them.  Similarly, the Court found that Plaintiff's claims for monetary damages under RLUIPA against the individual Defendants sued in their individual capacities are barred by the Eleventh Amendment.  Moreover, the Court held that, although Plaintiff's claims for injunctive relief seeking to enjoin an official to conform his or her conduct to constitutional requirements are not barred by the Eleventh Amendment, the claims are nevertheless moot because Plaintiff has been released from custody.

Next, the Court found that although Plaintiff failed to allege Defendant Cuomo's personal involvement, he sufficiently alleged that Defendant Bellamy was involved in the grievance appeal to plausibly suggest that she was personally involved in the alleged unconstitutional conduct.  The Court denied Defendants' motion as to Plaintiff's procedural due process claim relating to his

keeplock confinement.  Further, the Court dismissed Plaintiff's due process claims relating to his

denial of an education and parole release.

Regarding Plaintiff's RLUIPA claims relating to the alleged denial of his right to

participate in Islamic classes and religious services, the Court found that although Plaintiff does

not articulate the nature of the classes, the number of times he was deprived of participating in

religious services, and why or how the deprivation substantially burdened him, a properly pled

complaint may state a plausible claim under the First Amendment.  As such, the Court found that

Plaintiff should be permitted to amend his complaint as to this claim.  Finally, the Court found

that Defendants are entitled to qualified immunity as to all claims regarding the creation or

enforcement of the "dreadlock policy" "[b]ecause the law surrounding the wearing of dreadlocks

by non-Rastafarians is unclear, 'a reasonable DOCS official would not have realized that his

creation or enforcement of DOCS' hair policy was unlawful.'"  *See* Dkt. No. 42 at 20 (quoting

*Pilgrim v. Artus*, No. 9:07-CV-1001, 2010 WL 3724883 (N.D.N.Y. Mar. 18, 2010)).

Currently before the Court is Defendants' June 28, 2013 motion for summary judgment

seeking dismissal of Plaintiff's remaining claims.  *See* Dkt. No. 50.


## II. BACKGROUND

During the entire time frame relevant to this matter – May 19, 2008 through April 7, 2009

– Plaintiff was incarcerated at the Clinton Correctional Facility ("Clinton C.F.").  *See* Dkt. No.

50-1 at ¶ 1.[1]  Moreover, during the relevant time period, Plaintiff wore his hair in dreadlocks.  *See*

*id.* at ¶ 3.  During this time period, DOCCS maintained a directive under which, among other

---

[1] Unless otherwise noted, the facts set forth in this Memorandum-Decision and Order are
not in dispute.

things, only inmates registered under the Rastafarian faith were permitted to wear dreadlocks. *See id.* at ¶ 4. This directive has been further interpreted and explained through decisions of the CORC. *See id.*

On or about May 19, 2008, shortly after his transfer into Clinton C.F., Plaintiff was brought to the facility's inmate identification room for processing. *See id.* at ¶ 5. Pursuant to facility policy, all new inmates at the facility are required to undergo identification processing, which includes the taking of a photograph for an identification card. *See id.* at ¶ 6. At this time, Defendant Moller was the identification officer at Clinton C.F. who handled the identification process. *See id.* at ¶ 7. Upon seeing Plaintiff, Defendant Moller noticed his dreadlock hairstyle and inquired on his computer as to Plaintiff's religious designation in order to determine whether Plaintiff satisfied the Rastafarian exception to Directive 4914. *See id.* at ¶ 8. Defendant Moller determined that Plaintiff was registered with DOCCS as Islamic, not a Rastafarian. *See id.* at ¶ 9.

Since Plaintiff was not a registered Rastafarian, Defendant Moller deemed Plaintiff to be in violation of DOCCS' Directive 4914, as dreadlocks are not an approved DOCCS' hairstyle. *See id.* at ¶ 10; *see also* Dkt. No. 50-9. To this end, Defendant Moller explained the policy to Plaintiff, provided him with a copy of the policy, and gave Plaintiff thirty (30) days to comply with the policy. *See id.* at ¶ 11; *see also* Dkt. No. 52-12 at ¶ 11. Defendant Moller handwrote on the copy of the inmate hair policy provided to Plaintiff the following: "Rastafarians can only have dreadlocks – you are Muslim" and "given 30 days to comply." *See id.* at ¶ 12. Defendant Moller did not issue Plaintiff a ticket at this point, and instead gave Plaintiff time within which to comply with the policy. *See id.* at ¶ 13.

Following this interaction with Defendant Moller, on or about May 21, 2008, Plaintiff submitted an inmate grievance, No. CL-57150-08, regarding DOCCS' dreadlock policy and his

interaction with Defendant Moller. *See id.* at ¶ 14. Plaintiff's grievance was denied at all three

levels. *See id.* at ¶ 15. In rendering its decision, the CORC cited its prior decisions on this issue

and held, in pertinent part: "CORC asserts that only inmates of Rastafarian faith may have

dreadlocks. CORC also notes that CORC decisions have the same affect as departmental

directives." *See id.* As part of the grievance review process, Defendant Moller was asked to

write a memorandum describing his role in the grieved conduct, which he submitted on June 6,

2008. *See id.* at ¶¶ 16-17.

On October 7, 2008, after returning to Clinton C.F. from a court trip outside of the facility,

Plaintiff was taken back to the inmate identification room. *See id.* at ¶ 18. For security reasons,

whenever an inmate leaves the facility, upon his return he is required to attend identification

processing. *See id.* at ¶ 19. Defendant Moller was again working as the intake officer on October

7, 2008. *See id.* at ¶ 20. Upon seeing Plaintiff, Defendant Moller recalled his prior encounter

from May 19, 2008 wherein he counseled Plaintiff regarding his non-compliance with DOCCS'

Directive 4914 and directed him to comply with the dreadlock policy within thirty (30) days. *See

id.* at ¶ 21; *see also* Dkt. No. 52-12 at ¶ 21. At the time of this second encounter, Plaintiff still

wore a dreadlock hairstyle. *See id.* at ¶ 22.

On October 8, 2008, Defendant Moller inquired with the facility chaplain's office to

determine whether Plaintiff had changed his religious designation to Rastafarian. *See id.* at ¶ 23.

Defendant Moller discovered that Plaintiff's religious designation was still listed as Islamic. *See

id.* at ¶ 24. Since Plaintiff still had dreadlocks and did not qualify for the Rastafarian exception to

the dreadlock hair policy, Defendant Moller determined that Plaintiff had not come into

compliance with the policy as he had been directed to do on May 19, 2008. *See id.* at ¶ 25. On

October 9, 2008, Defendant Moller issued Plaintiff a misbehavior report for failing to comply with a direct order. *See id.* at ¶ 26.

On or about October 14, 2008, Defendant Miller conducted a Tier II disciplinary hearing regarding the infraction reported by Defendant Miller's misbehavior report. *See id.* at ¶ 28. Plaintiff entered a plea of guilty to the charges. *See id.* at ¶ 29. During the hearing, Plaintiff admitted that he was still not in compliance with the directive. *See id.* at ¶ 30; *see also* Dkt. No. 50-16 at 4. Based on Plaintiff's guilty plea and the underlying facts, Defendant Miller rendered a guilty disposition at the hearing and sentenced Plaintiff to fifteen days keep-lock confinement running from October 9, 2008 through October 24, 2008. *See id.* at ¶ 31.

On or about October 23, 2008, Plaintiff filed another grievance, No. CL 58011-08, purportedly challenging the misbehavior report issued by Defendant Moller and the underlying dreadlock policy. *See id.* at ¶ 32. In sum, Plaintiff claims that Directive 4914 is discriminatory and that, as such, Defendant Moller's order to comply with it constituted a violation of Plaintiff's constitutional rights. *See id.* at ¶ 33. Defendant Menard, as a facility security supervisor in Plaintiff's area of the prison, was assigned to investigate the grievance. *See id.* at ¶ 34. As per facility policy, Defendant Moller, as the subject of the grievance, was asked to provide a statement. *See id.* at ¶ 36. In his statement, Defendant Moller again reemphasized the basis for his issuance of a misbehavior report being Plaintiff's failure to comply with Directive 4914. *See id.* at ¶ 37. On November 4, 2008, Defendant Artus denied Plaintiff's grievance and the CORC unanimously denied the appeal. *See id.* at ¶ 38.

On January 7, 2009, Defendant Menard observed Plaintiff at the East Mess Hall "on the way to feed-up still wearing his dreadlock hairstyle." *See id.* at ¶ 39. Defendant Menard again explained to Plaintiff his non-compliance with Directive 4914 and gave Plaintiff a direct order to

come into compliance with the dreadlock policy within two weeks. *See id.* at ¶ 40; *but see* Dkt. No. 52-12 at ¶ 40 (admitting "that Sgt. Menard explained to plaintiff his non-compliance with Directive 4914 and gave plaintiff a direct order to come into compliance with the dreadlock policy within two weeks, but deny[ing] that Sgt. Menard directed plaintiff to come into compliance by either cutting his hair or changing his religious designation to Rastafarianism to meet the policy exception"). Pursuant to this two-week deadline, Plaintiff had to comply with the dreadlock policy by January 21, 2009. *See* Dkt. No. 50-1 at ¶ 41.

On or about January 12, 2009, Plaintiff appears to have written to Clinton C.F. Rastafarian Chaplain (Sprenger) in an attempt to change his religious designation to Rastafarian. *See id.* at ¶ 42. In his letter, Plaintiff asserts that the requested change in religion would be "'against his will' and compulsory not voluntary." *See id.* at ¶ 43. In light of Plaintiff's assertion that the change was against his will, Chaplain Sprenger denied the request, noting that, "[s]ince religious preference must in principle be a free choice we in the Chaplain's Office cannot, in good conscience, send you a religion change form at this time. . . . We encourage you to continue practicing your chosen faith while abiding by the policies and regulations of the Department of Correctional Services." *See id.* at ¶ 44 (quotation omitted).

On or about January 20, 2009, Plaintiff submitted a grievance, No. CL-58479-09, seemingly challenging Defendant Menard's January 7, 2009 interaction with him wherein he advised Plaintiff to comply with the dreadlock policy. *See id.* at ¶ 45. The grievance was ultimately denied by the facility superintendent with a finding of "no staff malfeasance." *See id.* at ¶ 47.

On January 21, 2009, Defendant Menard observed Plaintiff entering the East Mess Hall still "donning the dreadlock hairstyle." *See id.* at ¶ 48. Prior to this second encounter, Defendant

Menard had learned from Chaplain Springer that Plaintiff had not changed his religious designation from Muslim to Rastafarian. *See id.* at ¶ 49. As Plaintiff was still in violation of the policy following the two-week compliance period provided by Defendant Menard, he issued Plaintiff a misbehavior report for refusing a direct order and "interference with employee." *See id.* at ¶ 50.

On or about January 26, 2009, Defendant Miller conducted a Tier II disciplinary hearing regarding the infraction reported by Defendant Menard's misbehavior report. *See id.* at ¶ 52. Plaintiff entered a plea of not guilty to the charges. *See id.* at ¶ 53. After the hearing, in which Defendant Miller interviewed Plaintiff, Defendant Menard and a witness of Plaintiff's selection, Defendant Miller rendered a guilty disposition and sentenced Plaintiff to thirty (30) days keeplock confinement running through February 20, 2009. *See id.* at ¶ 54.

On or about January 27, 2009, while under keeplock confinement, Plaintiff submitted a request to Clinton C.F.'s deputy superintendent of security to attend Islamic Juma'ah religious services on January 30, 2009 despite his keeplock status. *See id.* at ¶ 55. Captain Uhler denied Plaintiff's request. *See id.* at ¶ 56. According to Defendants, "[p]ursuant to facility security policy inmates on keeplock status due to security reasons, such as disciplinary infractions, are generally not permitted to attend in-person religious services." *See id.* at ¶¶ 57, 59.[2] Moreover, inmates while on keeplock status are permitted to worship on their own and provided materials necessary to observe their faith in their cell. *See id.* at ¶ 58.

On February 12, 2009, Defendant Farrell was an officer working on E-block at Clinton C.F. *See id.* at ¶ 62. E-block was an exclusively keeplock unit at that time and it was where

---

[2] Although Plaintiff denies this assertion, he provides neither an explanation as to why he denies this statement, nor a citation to the record to the support his denial. *See* Dkt. No. 52-12 at ¶¶ 57, 59.

Plaintiff was serving his keeplock term. *See id.* at ¶¶ 62-63. While Plaintiff was serving his term

of keeplock confinement on E-block, Defendant Farrell was notified that a cell was needed on E-

block to transfer in a long-term keeplock inmate. *See id.* at ¶ 64. To this end, Defendant Farrell

was tasked with identifying the inmate on the block with the least amount of time left on his

keeplock term which, as of February 12, 2009, was Plaintiff. *See id.* at ¶¶ 65-66.

In order to locate the inmate with the least amount of time remaining on his keeplock

term, Defendant Farrell had to review the misbehavior reports and hearing disposition materials

for the inmates on E-block. *See id.* at ¶ 67. During this review, Defendant Farrell learned the

reason for Plaintiff's keeplock confinement, *i.e.*, failure to comply with a direct order to come into

compliance with Directive 4914. *See id.* at ¶ 68. As such, Defendant Farrell approached Plaintiff

with the intention of discussing his transfer to another cell. *See id.* at ¶ 69. Upon visiting

Plaintiff's cell, Defendant Farrell observed that Plaintiff still had dreadlocks and, therefore, was

still not in compliance with Directive 4914. *See id.* at ¶ 70. Defendant Farrell informed Plaintiff

of his continuing violation of facility haircut policy and further informed Plaintiff of the

procedure for obtaining a haircut while in keeplock on E-block. *See id.* at ¶ 71. Plaintiff

informed Defendant Farrell that he would not change his hairstyle, make a request for a haircut,

or change his religious designation to come into compliance with facility policy. *See id.* at ¶ 72.

Defendant Farrell then gave Plaintiff a direct order to comply with DOCCS's hair policy. *See id.*

at ¶ 73. As a result, Defendant Farrell issued Plaintiff a misbehavior report for failure to comply

with a direct order. *See id.* at ¶ 74.

On or about February 16, 2009, Defendant Miller conducted a Tier II disciplinary hearing

regarding the infraction reported by Defendant Farrell's misbehavior report. *See id.* at ¶ 75.

Plaintiff entered a guilty plea to the charges. *See id.* at ¶ 76. Based on Plaintiff's guilty plea and

the underlying facts, Defendant Miller rendered a guilty disposition at the hearing and sentenced Plaintiff to thirty (30) days keeplock confinement running from February 20, 2009 through March 22, 2009.  *See id.* at ¶ 77.

Plaintiff asserts that on February 26, 2009, he submitted paperwork to the facility to change his religion from Islamic to Rastafarian.  *See id.* at ¶ 78.  The change of religious designation did not become effective until March 23, 2009.  *See id.* at ¶ 79.

On March 21, 2009, Plaintiff was released from keeplock confinement after serving thirty days for Defendant Farrell's misbehavior report.  *See id.* at ¶ 80.  On April 2, 2009, Defendant Menard encountered Plaintiff while making his rounds and noticed that Plaintiff still had dreadlocks.  *See id.* at ¶ 81.  Defendant Menard told Plaintiff that he was still in violation of DOCCS' policy, to which Plaintiff responded that he had changed his religious designation to Rastafarian.  *See id.* at ¶¶ 82-83.  Thereafter, Defendant Menard checked with the facility chaplain's office and was advised that they did not have Plaintiff's change of religious designation on file.  *See id.* at ¶ 84.  As a result, Defendant Menard issued Plaintiff a misbehavior report for failure to comply with a direct order.  *See id.* at ¶ 85.

On April 7, 2009, Defendant Miller conducted a Tier II disciplinary hearing regarding the infraction reported by Defendant Menard's April 2, 2009 misbehavior report.  *See id.* at ¶ 86.  On investigation into the charge, Defendant Miller accessed Plaintiff's FPMS screen and determined that Plaintiff's religious designation was changed to Rastafarian effective March 23, 2009.  *See id.* at ¶ 87.  As a result, Defendant Miller determined that Plaintiff was in compliance with Directive 4914 and, therefore, did not violate Defendant Menard's direct order as alleged in the misbehavior report.  *See id.* at ¶ 88.

Currently before the Court is Defendants' motion for summary judgment as to Plaintiff's

remaining claims.

## III. DISCUSSION

**A.    Relief under 42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**B.    Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at

11

36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## C.    First Amendment retaliation

Defendants contend that the Court should dismiss Plaintiff's First Amendment retaliation claims, which he has brought against Defendants Bellamy, Artus, Moller, Menard, Farrell and Miller.  *See* Dkt. No. 50-29 at 13-18.  Plaintiff's First Amendment retaliation claims are all founded on the same set of facts and premise: that Defendants retaliated against Plaintiff for his submission of grievances by issuing him misbehavior reports.  In their motion, Defendants contend that Plaintiff "concedes and the record is clear that at the time of the issuance of each misbehavior report [P]laintiff was in violation of Directive 4914 and as such had failed to follow direct orders to comply with the directive.  As such, for each misbehavior report at issue there

exists a viable basis, independent of any claim of retaliation, there was an independent, proper

basis for the ticket. This principal alone dictates that as a matter of law [P]laintiff's First

Amendment retaliation claims must be dismissed." *See id.* at 13-14. Additionally, Defendants

assert that Defendants Bellamy, Artus and Miller were not personally involved in any of the

claimed retaliatory conduct. *See id.* at 16-18.


### 1. Merits of Plaintiff's retaliation claims

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,'

because 'virtually any adverse action taken against a prisoner by a prison official – even those

otherwise not rising to the level of a constitutional violation – can be characterized as a

constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)

(quotation and other citation omitted). "To prove a First Amendment retaliation claim under

Section 1983, a prisoner must show . . . '(1) that the speech or conduct at issue was protected, (2)

that the defendant took adverse action against the plaintiff, and (3) that there was a causal

connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d

119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights constitutes an adverse action for a claim

of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted). In making

this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more

than average citizens, before a retaliatory action taken against them is considered adverse."

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v.

Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (internal quotation marks and

citations omitted).  The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling."  *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (citations omitted).

In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation."  *Cole v. New York State Department of Correctional Services*, No. 9:10-CV-1098, 2012 WL 4491825, *11 (N.D.N.Y. Aug. 31, 2012) (citing *Colon*, 58 F.3d at 872-73).

Upon satisfying his initial burden, "the burden shifts to defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, *i.e.*, 'even if they had not been improperly motivated.'"  *Davidson v. Desai*, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting *Graham*, 89 F.3d at 80).  "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."  *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999); *see also Murray v. Hulihan*, 436 Fed. Appx. 22, 23 (2d Cir. 2011) ("Defendants cannot be liable for First Amendment retaliation if they would have taken the adverse action even in the absence of the protected conduct").

In the present matter, Plaintiff has failed to establish that he was retaliated against for engaging in protected activity.  Initially, when Plaintiff transferred to Clinton C.F. on May 19, 2008, Defendant Moller directed Plaintiff to come into compliance with the dreadlock policy within thirty (30) days – no misbehavior report was issued at this time.  Plaintiff filed a grievance

on May 21, 2008.  *See* Dkt. No. 50-1 at ¶¶ 11-14.  As such, Plaintiff's protected activity occurred

after the alleged retaliatory conduct and, therefore, cannot support a claim of First Amendment

retaliation.  Moreover, on October 7, 2008, after returning to Clinton C.F. from a court trip

outside the facility, Defendant Moller again processed Plaintiff at intake and noticed that Plaintiff

had still not come into compliance with the dreadlock policy.  *See id.* at ¶¶ 18-26.  As such,

Defendant Moller issued Plaintiff a misbehavior report on October 9, 2008.  *See id.* at ¶ 26.  This

lapse of nearly five (5) months between Plaintiff's purported protected activity and Defendant

Moller's alleged retaliatory conduct is insufficient, by itself, to establish the necessary causal

relationship.  *See Stoddard v. Eastman Kodak Co.*, 309 Fed. Appx. 475, 480 (2d Cir. 2009)

(holding that "where the protected activity took place two months prior to the alleged adverse

action, and where there is nothing other than that temporal proximity invoked to establish a

retaliatory intent, the causal relationship is not established"); *Dixon v. International Federation of*

*Accountants*, 416 Fed. Appx. 107, 110 (2d Cir. 2011) (holding that a temporal proximity of four

months between an employee's complaints of discrimination and her termination was insufficient,

without more, to show causal connection between protected activity and termination).

   Thereafter, on January 7, 2009, Defendant Menard observed Plaintiff with dreadlocks.

*See* Dkt. No. 50-1 at ¶¶ 39-40.  Defendant Menard gave Plaintiff two (2) weeks to comply with

the dreadlock policy.  *See id.* at ¶ 41.  Plaintiff filed a grievance on January 20, 2009, and

Defendant Menard filed a misbehavior report on January 21, 2009.  Although the temporal

proximity is sufficiently close in time to give rise to an inference of a causal connection, the

record makes clear that Defendant Menard would have issued this misbehavior report regardless

of Plaintiff's protected activity.  Defendant Menard gave Plaintiff two weeks to comply with the

dreadlock policy and indicated that such a report would issue if Plaintiff failed to come into

compliance.  Thus, "the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone[.]"  *Davidson*, 193 F.3d at 149; *see also Smith v. Donahue*, No. 03-CV-325F, 2005 WL 1460173, *5 (W.D.N.Y. June 21, 2005).

The next alleged instance of retaliation occurred on February 2, 2009, when Defendant Farrell issued Plaintiff a misbehavior report while Plaintiff was in keeplock.  Plaintiff has not alleged any protected activity taken against Defendant Farrell and has not demonstrated how any of his other instances of protected conduct are in any way causally connected to Defendant Farrell's report.  Additionally, this claim of alleged retaliation must fail because, as discussed, the undisputed facts demonstrate that Defendant Farrell issued the misbehavior report for Plaintiff's admitted failure to obey a direct order to come into compliance with Directive 4914.  *See* Dkt. No. 50-1 at ¶¶ 69-74.  As such, this Defendants have established an independent reason for the misbehavior report aside from any alleged protected activity.  *See Smith*, 2005 WL 1460173, at *5.

Finally, on April 2, 2009, Defendant Menard again issued Plaintiff a misbehavior report for his alleged failure to comply with the dreadlock policy.  *See* Dkt. No. 50-1 at ¶¶ 81-85.  Prior to issuing Plaintiff the misbehavior report, Defendant Menard checked with the facility chaplain's office to ascertain whether Plaintiff had changed his religious designation to Rastafarian.  *See id.* Upon being informed by the chaplain's office that they did not have the change of designation on file, Defendant Menard issued the report.  *See id.*  Plaintiff was eventually found not guilty at the hearing when it was determined that he had in fact complied with Directive 4914.  *See id.* at ¶¶ 86-88.  As such, the undisputed evidence establishes that Defendant Menard issued the April 2, 2009 misbehavior report only after receiving incorrect information from the chaplain's office indicating that Plaintiff was still not in compliance with the dreadlock policy.  This information

alone establishes that the misbehavior report would have been filed even absent any protected activity. *See Smith*, 2005 WL 1460173, at *5. Finally, the last alleged time Plaintiff engaged in protected activity was on January 20, 2009, when he filed his grievance against Defendant Menard and the dreadlock policy. Such a span of time, without more, fails to establish a causal connection between the alleged retaliatory conduct and the protected activity. *See Stoddard*, 309 Fed. Appx. at 480; *Dixon*, 416 Fed. Appx. at 110.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claims.

### 2. Personal involvement

"It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Therefore, a supervisory official may not be held liable solely on the ground that they held a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citation omitted). However, supervisory personnel may satisfy the personal involvement requirement if:

> (1) The defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Coughlin*, 58 F.3d at 873.

Personal involvement is a question of fact and must be satisfied as to each individual

defendant. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citation omitted). "A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 237 (W.D.N.Y. 2009). Merely writing a letter of complaint does not provide the personal involvement necessary to maintain a section 1983 claim against an individual defendant. *See id.* at 238. However, if the official "personally look[s] into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." *Id.* (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)).

As Defendants correctly contend, Plaintiff has failed to set forth any evidence that Defendants Bellamy, Artus and Miller were personally involved in any of the alleged retaliatory actions. Plaintiff has failed to allege their personal involvement in the issuance of the misbehavior reports and the record suggests that these Defendants are only part of Plaintiff's First Amendment retaliation claim because of their supervisory level positions. *See* Dkt. No. 50-3 at 34-36 (stating that Defendants Bellamy, Artus and Miller knew about the retaliation, condoned it and should have stopped it from happening). These allegations, without more, are insufficient to find Defendants Bellamy, Artus and Miller personally involved in the alleged retaliatory conduct.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim against Defendants Bellamy, Artus and Miller.

**D.      Plaintiff's First Amendment Free Exercise and RLUIPA claims[3]**

---

[3] In the October 23, 2012 Report-Recommendation and Order, Magistrate Judge Hummel found that Plaintiff failed to articulate sufficient facts to allege a plausible First Amendment free

(continued...)

In his complaint, Plaintiff claims that Defendants Bellamy, Artus, Moller, Menard, Farrell and Miller violated his right to the free exercise of his religion under the First Amendment and the RLUIPA. These claims are all founded on the theory that Plaintiff's rights were violated by the issuance of misbehavior reports and imposition of penalties causing him to miss certain religious ceremonies and classes while in keeplock confinement.

Plaintiff's religious-liberty claims derive from two different sources: the Free Exercise Clause of the First Amendment, and § 3 of RLUIPA, 42 U.S.C. § 2000cc–1. The First Amendment's Free Exercise Clause, applicable to the States through the Fourteenth Amendment, *see Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

---

[3](...continued)

exercise claim. *See* Dkt. No. 42 at 18. Specifically, Magistrate Judge Hummel noted that, "[w]hile Jouvert does not articulate the nature of the classes, the number of times he was deprived of participating in religious services, and why or how the deprivation substantially burdened him, a properly pled complaint may state a plausible claim under the First Amendment." *See id.* As such, Magistrate Judge Hummel recommended that Plaintiff be permitted to amend his complaint as to this claim. *See id.*

In the Court's Decision and Order adopting Magistrate Judge Hummel's Report-Recommendation and Order, the Court noted that, in the section entitled "Conclusion" of the Report, Magistrate Judge Hummel "incorrectly lists Plaintiff's 'First Amendment free exercise claims . . . with respect to the denial of attending religious classes and services' as surviving claims." *See* Dkt. No. 43 at 7. The Court found that Magistrate Judge Hummel's substantive discussion of this claim was correct and attributed the inclusion of this claim in the conclusion as an "apparent scrivners error." *See id.*

Plaintiff never filed an amended complaint. Despite this, in their motion for summary judgment, Defendants have treated Plaintiff's First Amendment free exercise claim as surviving and addressed the claim in the merits of their motion. *See* Dkt. No. 50-29 at 3 (citing Dkt. No. 42). Although the Court is unsure why the parties have treated this claim as surviving without Plaintiff having filed an amended complaint, the Court will do the same and address the merits of the claim. Since the record is now fully developed and Plaintiff has been provided with an opportunity to further explain and support this claim, and because Defendants will not be prejudiced as they have treated the claim as surviving, the Court will address its merits.

U.S. Const., amend. I.  In the prison context, the Free Exercise Clause is subject to some

limitation, given both "the fact of incarceration and . . . valid penological objectives – including

deterrence of crime, rehabilitation of prisoners, and institutional security."  *O'Lone v. Estate of*

*Shabazz*, 482 U.S. 342, 348 (1987).

Enacted in 2000, with the intention of providing greater protection to prisoners from

burdens imposed by the government of their religions, RLUIPA prohibits governmental

imposition of a "substantial burden on the religious exercise" of an inmate, unless defendants can

show that the burden is: (1) in furtherance of a compelling governmental interest; and (2) is the

least restrictive means of furthering that compelling governmental interest.  42 U.S.C. §

2000cc–1(a); *see also Washington v. Klem*, 497 F.3d 272, 276–77 (3d Cir. 2007).  Compared to

RLUIPA, the First Amendment is "less generous" to prisoners, since "a generally applicable

policy will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is

reasonably related to legitimate penological interests.'"  *Redd v. Wright*, 597 F.3d 532, 536 (2d

Cir. 2010) (quoting *O'Lone*, 482 U.S. at 349).

### *1. Immunity from monetary damages under RLUIPA*

The Supreme Court recently interpreted the "appropriate relief" language in RLUIPA, 42

U.S.C. § 2000cc–2(a), in *Sossamon v. Texas*, ___U.S. ___, 131 S. Ct. 1651, 179 L. Ed. 2d 700

(2011), and held that by accepting federal funds, states do not consent to waive their immunity to

suits for monetary damages under RLUIPA. RLUIPA's express private cause of action "is not the

unequivocal expression of state consent that [the Supreme Court's] precedents require."

*Sossamon*, 131 S. Ct. at 1658.  The Supreme Court explained that "appropriate relief" does not

clearly include money damages; rather, the word "appropriate" "is inherently context-dependent."

*Id.* at 1659 (citations omitted).  According to the *Sossamon* Court, "[t]he context [under RLUIPA] – where the defendant is a sovereign – suggests, if anything, that monetary damages are not 'suitable' or 'proper.'"  *Id.* (citing *Federal Mar. Comm'n v. S.C., State Ports Auth.*, 535 U.S. 743, 765, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002)).

In light of *Sossamon*, Plaintiff's claims for monetary damages under RLUIPA against Defendants in their official capacities must be dismissed.  Moreover, since Plaintiff has been released from prison, any claim for injunctive relief is moot.

Further, while § 2000cc–5(4)(A) seems to imply at first glance that individual officers can be liable in their personal capacities, *see Orafan v. Goord*, No. 00 Civ.2022(LEK)(RFT), 2003 WL 21972735, *9 (N.D.N.Y. Aug. 11, 2003) (holding that the "plain language of the statute" indicates that prison officers can be held liable in their individual capacity pursuant to RLUIPA), there is a growing consensus among courts that, because RLUIPA was passed under Congress's Spending Power, the statute cannot expose individual officers to liability, *see, e.g.*, *Pugh v. Goord*, 571 F. Supp. 2d 477, 506-07 (S.D.N.Y. 2008) (explaining that the individual officers are not, "at least in their individual capacities, 'contracting' parties who received federal funds" (citing *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007)); *see also Prescott v. Annetts*, No. 09 Civ. 4435(CM)(LMS), 2010 WL 3020023, *7 (S.D.N.Y. July 22, 2010) ("Although the Second Circuit has not decided the issue, numerous district courts in this Circuit have held that RLUIPA does not authorize claims for money damages against individual defendants in either their individual or official capacities"); *Jones v. Fischer*, No. 9:11-cv-774, 2013 WL 4039377, *12 (N.D.N.Y. Aug. 7, 2013) (citations omitted).  As such, Plaintiff's RLUIPA claims against the individual Defendants are dismissed.

### 2. First Amendment Free Exercise claim

The analysis of Plaintiff's free-exercise claims proceeds under the framework, set forth by the Supreme Court in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). "In *O'Lone*, the Court acknowledged that, although prisoners do not abandon their constitutional rights at the prison door, '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Id.* (quoting *O'Lone*, 482 U.S. at 348, 107 S. Ct. 2400) (other quotation omitted); *see also Turner v. Safley*, 482 U.S. 78, 84 (1987). "Accordingly, the Court held that a challenged prison regulation is judged 'under a "reasonableness" test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *O'Lone*, 482 U.S. at 349, 107 S. Ct. 2400) (other quotation omitted).

"Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Id.* (citing *Turner*, 482 U.S. at 90-91, 107 S. Ct. 2254). "The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Id.* (citing *O'Lone*, 482 U.S. at 350, 107 S. Ct. 2400) (other citations omitted).

"The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citation and footnote

omitted).  "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; 'the burden remains with the prisoner to show that these [articulated] concerns were irrational.'" *Id.* at 275 (quotation omitted); *see also Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127-28 (1977) (holding that prison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof).

In his deposition, Plaintiff testified that he was not permitted to attend approximately twelve congregate religious services, known as Jumu'ah, while he was held in keeplock confinement.  *See* Dkt. No. 50-3 at 38-40.[4]  Moreover, Plaintiff testified that, while he was in keeplock, he was unable to attend approximately twelve-to-sixteen classes dedicated to teaching the tenets of his religion.  *See id.* at 39-40.  Plaintiff noted, however, that while he was in keeplock confinement, the Imam would provide various religious services so long as he was registered as a Muslim.  *See id.* at 40-41.  Further, the record makes clear that Plaintiff was permitted to individually practice his religion while in keeplock.  Although Plaintiff has failed to provide specific information regarding the "classes" he missed while in keeplock, for purposes of this Memorandum-Decision and Order, the Court assumes that denial of attendance at Jumu'ah services substantially burdened Plaintiff's sincerely held religious beliefs.

Despite this showing, Defendants have established a legitimate penological interest in denying Plaintiff the right to attend congregate Jumu'ah services and religious classes while in keeplock.  As Defendants correctly note, the record only contains one formal request from Plaintiff to attend a Jumu'ah service.  *See* Dkt. No. 50-28.  The request, which is not dated, states

---

[4] "Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer." *O'Lone*, 482 U.S. at 345 (citing Koran 62:9-10).

that "I'm requesting permission to attend Jumu'ah (Islamic) services this Friday, January 30,

200[9]." *See id.* Captain Uhler, who is not a defendant in this action, denied the request. *See id.*

In his affidavit in support of the motion for summary judgment, Mr. Uhler provided that,

during the relevant time, he was a security captain at Clinton C.F. *See* Dkt. No. 50-27 at ¶ 1. In

this capacity, Mr. Uhler reviewed Plaintiff's request to attend the January 30, 2009 Jumu'ah

services. *See id.* at ¶¶ 5-6, 9. Mr. Uhler explained that, "[p]ursuant to facility security

considerations inmates on keeplock status for disciplinary infractions are generally not permitted

to attend in-person religious services outside of their cell. Inmates on keeplock status are

permitted to worship on their own while on keeplock and provided materials necessary to observe

their faith in their cell." *See id.* at ¶ 8. Mr. Uhler further explained that movement of inmates in

disciplinary confinement, such as keeplock, is limited in light of the heightened security threat

such movement poses to staff and other inmates, and due to other disciplinary considerations. *See

id.* at ¶ 7. When reviewing a request to attend religious services, Mr. Uhler stated that his

decision to grant or deny the request would be "based on security considerations such as the

reason for inmate's keeplock confinement, severity or frequency of the conduct that resulted in the

keeplock confinement, security risk involved with the requested activity, etc." *See id.* at ¶ 10.

Regarding Plaintiff's request, Mr. Uhler stated that he considered Plaintiff's disciplinary history

and the security considerations involved in moving Plaintiff from keeplock as requested in

denying the request. *See id.* at ¶ 11. Mr. Uhler repeatedly indicates that he alone made this

decision, and that none of the named Defendants had any role or influence in the decision. *See id.*

at ¶¶ 5, 11.

First, these uncontroverted statements make clear that Defendants had a legitimate,

penological interest in denying Plaintiff's request. *See Diggs v. Volpe*, No. 11 Civ. 6382, 2013

WL 4015758, *9 (S.D.N.Y. Aug. 7, 2013) (citing cases).  Second, Plaintiff was provided at least two alternative means of exercising his right to practice his religion.  *See id.*; *see also O'Lone*, 482 U.S. at 351-52 (holding that it was reasonable to not allow attendance at Jumu'ah prayer services because the respondents were free to participate in other religious observances of their faith, including access to an imam and the provision of special meals).  Plaintiff was not prevented or discouraged from praying in his cell or otherwise practicing his religion.  Moreover, Plaintiff admitted that an imam was available for private visits.  *See id.*; *O'Lone*, 482 U.S. at 351-52.

Third, "[w]hen accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  *Turner*, 482 U.S. at 90 (citing *Jones*, 433 U.S. at 132-33).  In the present matter, it is clear that accommodation of Plaintiff's asserted right would cause strain on the personnel at the facility.

Courts have held that inmates do have some right to participate in congregational services, and indeed DOCCS Directive 4202 recognizes as much, stating that "[t]o the extent possible and consistent with the safety and security of the facility, authorized inmates shall be permitted . . . to observe their congregational worship services."  DOCCS Directive 4202 § F(2)(a).  Like many inmate rights, however, this right must be balanced against legitimate penological concerns.  In *Smith v. Artus*, No. 07–CV–1150, 2010 WL 3910086 (N.D.N.Y. Sept. 30, 2010), the court, though recognizing that "a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock," *id.* at *21, granted summary judgment for the defendants on the plaintiff's claim challenging a directive that SHU inmates could not attend congregate religious services, finding that the directive had valid,

25

rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources.  *See id.* at *31;[5] *see also Washington v. Afify*, No. 11-CV-6176, 2013 WL 4718693, *6-*7 (W.D.N.Y. Sept. 3, 2013) (same).

To the extent that Plaintiff is attempting to allege that he was denied his right to exercise his religion because he changed his religious designation to Rastafarian in lieu of cutting off his dreadlocks, the claim must fail.  During his deposition, Plaintiff claims that he was denied certain services necessary to practice his religion once he changed his religious designation to Rastafarian.  *See* Dkt. No. 50-3 at 37-41.  His testimony further makes clear, however, that having dreadlocks is not part of his Islamic faith and he acknowledges that he was free to cut off his dreadlocks at any time so as to be in compliance with the directive.  *See id.* at 9, 13-14, 16, 25.  At the time of his deposition, Plaintiff no longer had dreadlocks.  *See id.* at 13.  When asked why he no longer had them, Plaintiff indicated that several of his dreadlocks had been ripped out and that they did not grow back properly.  *See id.* (indicating that he no longer had dreadlocks because "I was looking crazy, man.  I wasn't feeling pretty").

Plaintiff's testimony makes clear that Plaintiff was not forced to change his religious designation to Rastafarian.  The record clearly establishes that Plaintiff voluntarily made that decision because it was the only way he could keep his dreadlocks and be in compliance with Directive 4914.  His hairstyle of choice had nothing to do with his beliefs as a practicing Muslim.  Plaintiff voluntarily chose to change his religious designation so that he could keep his

---

[5] On appeal, the Second Circuit vacated the district court's decision on other grounds, stating that the portion of the district court's decision addressing the religious-services issue "remain[s] undisturbed by this order."  *Smith v. Artus*, 2013 WL 1338359, at n.1 (2d Cir. Apr.4, 2013).

dreadlocks; as such, any burden this placed on his ability to freely exercise his actual professed religion was self imposed.  *See Washington*, 2013 WL 4718693, at *6.

Finally, as Defendants correctly contend, Plaintiff has failed to set forth any evidence or even allegations that any of the named Defendants were personally involved in the alleged deprivations.  As set forth by Deputy Superintendent of Security Uhler's affidavit, decisions regarding a keeplocked inmates request to attend religious services at Clinton C.F. during the relevant time frame were solely in his discretion as facility security captain.  *See* Dkt. No. 50-28. The record is clear that during the 2008-2009 time frame, Mr. Uhler, who is not a defendant in this action, reviewed and decided all inmate requests to attend religious services outside of their keeplock cells.  *See id.*  Mr. Uhler makes clear that these decisions were based upon his consideration of security issues without any influence from any of the named Defendants.  *See id.* Although the named Defendants rendered the keeplock confinement punishments that ultimately resulted in Plaintiff missing religious services, Plaintiff has not alleged that any of the Defendants were responsible for the creation or implementation of a policy that caused him to miss religious services.  *See Wilson v. Kelly*, No. 9:11-CV-30, 2012 WL 3704996, *11 (N.D.N.Y. Aug. 27, 2012).  As such, the Court finds that Plaintiff has failed to allege or introduce any evidence establishing the personal involvement of any named Defendant in his First Amendment free exercise claims.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to these claims.

**E.    Fourteenth Amendment due process claim**

Plaintiff alleges that Defendants violated his right to due process with respect to his terms

27

of keeplock confinement.  Defendants argue that Plaintiff's claim must be dismissed because

Defendants Bellamy, Artus, Farrell, Moller and Menard were not personally involved in the

alleged infringing conduct.  *See* Dkt. No. 50-29 at 24-25.  Further, Defendants claim that the due

process claim is substantively meritless.  *See id.* at 25-27.  Plaintiff, however, argues that the

evidence suggests that his keeplock confinement constituted an atypical and significant hardship.

*See* Dkt. No. 52-11 at 14-15.  Moreover, Plaintiff claims that he was deprived of his liberty

interest to be free from keeplock confinement because Defendants failed to satisfy the "some

evidence" standard in finding him guilty and because Defendant Miller failed to consult the

dreadlock policy to determine if it pertained to Plaintiff.  *See id.* at 15-16.

### 1. *"Atypical and significant" hardship*

The Fourteenth Amendment to the Constitution provides that "[n]o State shall . . . deprive

any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

"Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they

are nevertheless entitled to certain procedural protections when disciplinary actions subject them

to further liberty deprivations such as loss of good-time credit or special confinement that

imposes an atypical hardship."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

As a threshold matter, an inmate asserting a violation of his right to due process must first

establish that he had a protected liberty interest in remaining free from the confinement that he

challenges and, if so, that the defendant deprived the plaintiff of that liberty interest without due

process. *See Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349,

351 (2d Cir. 1996).  To establish a protected liberty interest, a prisoner must satisfy the standard

set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Thus, to show that a liberty interest is sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that his resulting confinement or restraint creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and that the state has enacted a regulation or statute which grants inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at 484; *see also Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335–36 (2d Cir. 1998).

In the present matter, Plaintiff has failed to put forth any evidence indicating that his periods of keeplock confinement created an atypical and significant hardship in relation to the ordinary incidents of prison life. In his memorandum of law, Plaintiff relies on Defendant Menard's deposition to support this claim. *See* Dkt. No. 52-11 at 14-15. Specifically, Plaintiff relies on Defendant Menard's testimony in which he describes what keeplock confinement typically entails at Clinton C.F. *See id.* Plaintiff claims that during keeplock "inmates are locked down for twenty-three (23) hours per day, with one (1) hour of recreation. Plaintiff was prevented from using the commissary on a biweekly basis, prevent[ed] from freely worshiping,

only had an hour of recreational time, and could not attend school or classes." *See id.* at 15.

These allegations are clearly insufficient to survive Defendants' motion for summary judgment.  "Courts in this Circuit have found that keeplock's differences from normal confinement — without more — do not amount to an atypical and significant hardship." *Holland v. Goord*, No. 05-CV-6295, 2013 WL 3148324, *6 (W.D.N.Y. June 19, 2013) (citation omitted). With regard to the denial of permission to attend congregate religious services and classes, such allegations are insufficient, without more, to satisfy Plaintiff's burden.  *See Wilson v. Kelly*, No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3705007, *9–*10 (N.D.N.Y. June 22, 2012) (finding that the plaintiff's inability to attend seven Muslim religious services, loss of his honor block cell status and loss of wages, which all occurred because he was held in keeplock for 45 days, did not constitute deprivation of a liberty interest) (citing *Farmer v. Hawk*, No. 94–CV–2274(GK), 1996 WL 525321, *6 (D.D.C. Sept. 5, 1996) ("Although Plaintiff alleges that her placement in controlled housing led to fewer privileges, less time outdoors, restrictions on recreational activities, and denial of access to religious services, educational programs and vocational programs, these deprivations are not so 'atypical' or 'significant ... in relation to the ordinary incidents of prison life' that they constitute deprivations of a liberty interest")), *report and recommendation adopted in relevant part*, 2012 WL 3704996 (N.D.N.Y. Aug. 27, 2012); *see also Arce v. Walker*, 139 F.3d 329, 336-37 (2d Cir. 1998) (holding that "deprivation of access to communal religious services, among others, did not implicate a state-created liberty interest") (citation omitted).

Plaintiff claims that he was placed in segregated keeplock for a total of seventy-five (75) days as a result of the October 2008, January 21, 2009, and February 12, 2009 misbehavior reports.  *See* Dkt. No. 52-11 at 14.  Plaintiff, however, does not allege that his keeplock

confinement was "atypical and significant" or that it affected the overall length of his criminal sentence. *See Jermosen v. Cahill*, 159 F.3d 1347 (2d Cir. 1998) (citations omitted). Even if the keeplock sentences are aggregated for a total of seventy-five days, Plaintiff has failed to allege a sufficient liberty interest. The Second Circuit has held that, "with respect to 'normal' SHU confinement, . . . a 101-day confinement does not meet the *Sandin* standard of atypicality." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation omitted).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to this claim.

### 2. *"Some evidence"*

Plaintiff argues that he was deprived of his liberty interest to be free from keeplock confinement. *See* Dkt. No. 52-11 at 15. Plaintiff claims that there is no evidence that Defendant Miller consulted any documents other than the misbehavior reports filed by Defendants Moller, Menard and Farrell when rendering his verdicts. *See id.* at 16. Plaintiff asserts that the record does not show that Defendant Miller independently consulted the dreadlock policy to determine if it applied to Plaintiff and, in fact, Defendant Miller testified that he does not often consult directives while conducting a hearing. *See id.* Plaintiff admits that he pled guilty to the October 2008 and February 2009 charges, but contends that no such plea was entered for the January 2009 ticket. *See id.* As such, Plaintiff argues that the guilty verdicts were not based on "some reliable evidence" of guilt. *See id.*

The due process protections afforded a prison inmate do not equate to "'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quotation omitted). "Nevertheless, an inmate is entitled to advance written notice of the

charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 556, 563-67 (1974)). "Since *Wolff*, the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by 'some evidence.'" *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling." *Id.* (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). Nevertheless, as the Second Circuit has explained, "the 'some evidence' standard requires some 'reliable evidence.'" *Id.* (quotation and other citation omitted).

The some evidence standard, detailed in *Superintendent v. Hill*, 472 U.S. 445 (1985), is satisfied if "'there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[P]rison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Hill*, 472 U.S. at 456 (requiring only a "modicum of evidence" to support a hearing decision).

In the present matter, Defendants correctly assert that some reliable evidence supported Defendant Miller's hearing dispositions. The evidence shows that Defendant Miller relied on the misbehavior reports and testimony of Defendants, Plaintiff and an inmate called by Plaintiff in rendering his decisions. Moreover, regarding the October 2008 and February 2009 dispositions, Plaintiff pleaded guilty to the charged conduct. *See West v. Parker*, 68 F.3d 466, 466 (5th Cir. 1995) (upholding the dismissal of the plaintiff's due process claim, finding that "[t]here is . . .

some evidence in the record, namely the charging officer's report and the fact that [the plaintiff] pleaded guilty, to support the decision reached at the prison disciplinary proceeding").

Plaintiff relies on a recent Second Circuit decision in his opposition. *See* Dkt. No. 52-11 at 15-16. In *Shabazz v. Bezio*, the plaintiff brought suit against various defendants employed at Clinton C.F. alleging, among other things, that his due process rights were violated at a disciplinary hearing during which he was found guilty for being in violation of Directive 4914 because he had dreadlocks but was not registered as a Rastafarian. *See Shabazz v. Bezio*, 511 Fed. Appx. 28, 30-31 (2d Cir. 2013). The district court granted the defendants' motion to dismiss the complaint and did not grant leave to amend. *See id.* The Second Circuit noted that, "[a]s a preliminary matter, although the adopted report and recommendation found that there was 'ample evidence' to support Bezio's guilty determination, the report and recommendation supported this finding by discussing prison regulations regarding the requirement that only registered Rastafarians were permitted to wear dreadlocks; however, a review of Bezio's 'Disciplinary Hearing Disposition Rendered' form states only that he considered 'Sgt. Rice's written report' and the information contained within that report." *See id.* at 32. Further, the court found that "[a]lthough Bezio's 'Disciplinary Hearing Disposition Rendered' form makes reference to Rice's order to Shabazz to 'cut [his] dreadlocks to comply with departmental grooming standards,' there is no indication that Bezio independently reviewed these 'departmental grooming standards' to verify the reliability of the only evidence he relied upon – Rice's 'written report.'" *See id.*

Although somewhat factually similar to the present case, *Shabazz* is distinguishable from the present matter. First, and quite significantly, *Shabazz* dealt with a district court's decision on a motion to dismiss and its failure to provide the plaintiff an opportunity to amend, whereas, in the present matter, Defendants have filed a motion for summary judgment after having completed

extensive discovery.  Second, the plaintiff in *Shabazz* attached to his complaint "two letters from the New York State Office of the Attorney General Division of Appeals and Opinions, which reversed and expunged the guilty determinations made at Shabazz's disciplinary hearings[.]" *Id.* at 30-31.  No such proof was offered in the present case.  Third, unlike *Shabazz* where discovery had not yet taken place, the record in the present matter makes clear that Defendant Miller was familiar with Directive 4914 in rendering his decisions.  *See* Dkt. No. 52-4 at 13-14.  Finally, in *Shabazz*, the plaintiff alleged that the defendant who conducted his Tier II hearing (Bezio) also investigated and ordered that a different corrections sergeant to issue the plaintiff a misbehavior report upon conclusion of his investigation.  The Second Circuit indicated that, in light of these allegations, "it cannot be said that Bezio had not 'prejudge[d] the evidence' submitted to him as a hearing officer, or that he could not say 'how he would assess evidence he has not yet seen' – since he had essentially already reviewed the evidence before he sat as a hearing officer." *Shabazz*, 511 Fed. Appx. at 31-32 (citation omitted).  In the present matter, no such allegations have been raised by Plaintiff against Defendant Miller.

Having reviewed the entire record, the Court finds that the challenged Tier II hearing dispositions were supported by some reliable evidence.  As such, the Court grants Defendants motion for summary judgment as to this claim.


**F.      Plaintiff's state law claims**

Plaintiff has asserted several claims pursuant to the New York State Constitution and Corrections Law.

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of

needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809

(2d Cir. 1979) (citation omitted).  Since the Court has dismissed all of Plaintiffs' federal claims, it

declines to exercise supplemental jurisdiction over their state-law claims and dismisses them

without prejudice pursuant to 28 U.S.C. § 1367(c)(3).


## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED**; and the Court

further

**ORDERS** that Plaintiff's federal claims are **DISMISSED with prejudice**; and the Court

further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close

this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that Ms. LaFerriere is relieved from any further duty to represent Plaintiff in

this matter.  The Court sincerely thanks Ms. LaFerriere and the law firm of Carter, Conboy, Case,

Blackmore, Maloney & Laird for accepting the Court's appointment in this case and for the

excellent representation afforded Plaintiff.

**IT IS SO ORDERED.**

Dated: September 16, 2013
      Albany, New York

Mae A. D'Agostino
U.S. District Judge